The next case for argument, United States v. Weigand and Akhavan. Thank you, Judge Lee, and may it please the Court. I'm Derek Schaffer here arguing on behalf of defendant Mr. Akhavan. For the defendants, Your Honor, I would propose to address the and the confrontation clause. Just to frame things at the outset, Your Honors, these convictions rest on an unprecedented and unbounded theory of bank fraud, one that gives any putative policy of a bank or even a credit card company the force of federal criminal law, such that anyone who allegedly induces a deviation from such a policy can, for that reason alone, be prosecuted under Section 1344, Subsection 2, despite the absence of any victim and any possible harm. To be clear, Your Honors, these defendants were convicted without proof that they intended to harm anyone or that the specific transaction information they allegedly misrepresented to U.S. banks ever mattered to banks' decisions to authorize card transactions elected and funded by willing cardholders. Affirmance of these convictions, Your Honors, requires jettisoning core established limitations of materiality and intent, and I propose to address those in turn. Let's start with materiality, Your Honors. The proof was, in our view, conclusive. It was overwhelming that the specific transaction information that went to U.S. issuing banks was immaterial to those banks' decisions. The banks were demonstrably processing transactions that were, on their face, marijuana-related. That's the circle evidence, Your Honors. It's also evidence of MedMen, another, that's a marijuana merchant, that was identified on statements that you can find at DJA 2087 and 2088 and HAX 10054, pages 32, 35, 36, so their banks could see this is marijuana-related and they processed it. Sorry, Judge Lay. No, no, I interrupted you, but I guess one thing I'm wondering is, so is your view that the issue is whether or not a reasonable bank would have relied on the illegality of the transactions or that a reasonable bank would have relied on the information, the specific falsified information? And if your view is the second, the latter, which I'm assuming it is, but you can correct me if I'm wrong, what do we make of the fact that if it is about whether or not the banks would have relied on the specific false information rather than illegality, the fact that there was this effort to disguise that information suggests in fact they would have relied on it. Thanks for the question, Judge Lay. Let me take it in turns. First, I think it's a good instance where you had states that had legalized these transactions, cardholders who were voluntarily and knowingly undertaking them, and you had the federal government. Testimony to the contrary. Well, Judge Chin, were there witnesses from the banks testifying that this did matter to us? Would we not have processed the transactions if we had known they involved marijuana? Bank of America, Mr. Cloud, did testify to that, Judge Chin. But just to be clear about his testimony, it was not that banks would not authorize those transactions. It was only that they would report it to the credit card companies, and then so long as the credit card companies didn't bounce the merchant, they would continue to process those transactions, and they were never, Judge Chin, never changing an approval decision. It's not significant that they would have reported the transactions to the credit card companies? I think as to materiality and whether banks were releasing their property and their funds based upon the non-marijuana related nature, I think it is, it's a uniform record, including from Bank of America. They never reversed an authorization decision, even when they knew a transaction was marijuana related. Never changed their approval decision. But I want to take the second part of Judge Lee's question, because the specific transaction information that went to U.S. banks was categorically different from the application banks, application packets that went to the merchant banks in Europe. And I'd point you to GJA 2233-35, Mr. Elliott's testimony. Please read that. That's the government's witness, and he acknowledges the application packs that went to the merchant banks in Europe to onboard specific merchants who were marijuana related, never went to the U.S. issuing banks. All the U.S. issuing banks got it to the following. Number one, the merchant name, which could be gobbledygook, even lawfully and ordinarily. Number two, the MCC, the code. There was no code for marijuana. Where it is accepted, it's for pharmacy products. No one's saying that the pharmacy code triggers a disapproval. That would be what was going to the U.S. issuing banks. And none of that, Judge Lee, none of that would have led those banks to conclude a particular transaction was marijuana related, even if we assume that with perfect information, they wouldn't have processed those. Sorry. Were codes being listed for other products? Judge, really, there's no textbook on how you code it. You said that there was no code for marijuana. What I'm asking is, did they list codes for other types of products in that information? I don't mean to be unfair to the question, but I don't think anyone knew what is the truthful code for marijuana. Because anything that you put in there. My question, did they list a code for sunglasses? Did they list a code for articles of clothing? That's what I'm asking. Was that ever part of the MCC information? Yes. I can't tell you specifically what the chapter and verse was of every one of those codes, obviously. My understanding is the representation was made that this was lawful merchandise, and I'm asking whether that was coded to reflect lawful merchandise. I mean, the absence of a code for marijuana is, you know, that may be, but if there is a representation being made that these are lawful products, then why isn't that a misrepresentation? Because I don't think that there was anything among the universe of lawful products that would differentiate and announce marijuana. And again, even when it was said in the information, this is ease, this is med men, that never triggered a disapproval. That's the record, Judge Chen. So there was no way to have truthful conveyance of information that would have led a bank to a different authorization decision. That's materiality for you, Your Honors. But on intent, on intent, the government makes it easy for you in the sense that they don't even claim to have shown that there was any intent to harm anyone in the transaction chain. They also acknowledge that this Court has held as it did in Chandler, that you need to have under the Federal Bank Fraud Statute, at least subsection one, there needs to be an intent to harm. That's part of criminal law, men's rights. But it was brought under subsection two, which does not include an intent to harm. But I think it does. I think that this Court has never held, no Court has held that you don't need, as you do for any fraud, to have some victim, someone you intend to be harming out there. And Chandler says, per the Wire Fraud Statute, the same intent is ascribed to Congress under the statute without limitation. And Judge Lee, think about what it would mean to hold that the government under subsection two can take the same bank where there's no intent to harm that bank or anyone else under subsection one. All they have to do is take this same prosecution where they need to show intent and can't show intent and say, well, that's subsection two, and the intent requirement goes away, and we'll treat the bank as the victim here. That just can't be right. I'd say... The fact that this is under subsection two and not under subsection one, the notion of intent to harm, I realize that there are decisions that say that, but it's kind of bizarre because characteristically people don't commit fraud for the purpose of harming somebody else. They commit fraud in order to get money from them. Their purpose is to get money for themselves, not to inflict harm. Well, I think the way that the courts have looked at it for subsection one two is to say if that's the natural upshot of what you are doing, you have that intent, or if it's the essential element of the transaction, you have that intent. So this has not been an insuperable barrier for the government, but it's been some sort of an impediment, and it protects the totally innocent... But if intent to harm means nothing other than intent to get money from somebody, then that's perfectly well satisfied. Well, but then that's everyone who banks, Judge LaValle. It's everyone who banks. That's the way the government looks at it. If you have an intent to transact and to make property move through a bank, that is requisite criminal intent. Everyone who is banking at that point has the requisite criminal intent, and that's astonishing. And so if you have a parent who has the child sign the credit card receipt... Is it astonishing for purposes of subsection two? I think it is, because that parent would have no defense against the prosecution if it came. Think about the underage college student who has an illegal transaction. They falsify their ID, say that they're entitled to buy alcohol. They do it with their credit card. Credit card company says, we won't, and banks say, we don't In this case, there would have been the perfectly valid defense that we don't mean to put the banks or anyone else at risk in terms of their money. That ought to be a valid defense of these defendants, and if it's not, then really there's no limit on how the government could use this theory with any number of innocent transactors. And this is... I'm sorry. I was just going to say, if you can wrap up... I've gone for a while. Sorry. The last point is, if I may, the confrontation clause. So there, as construed by the Supreme Court in Hemphill and in Crawford, you follow the text. You follow the historic command. And here we had video testimony of a key government witness whose company, Visa, was cited 42 times in the government's closing. Is your view that there cannot... What is the circumstance that would ever justify there not being in-person cross-examination? For a corporate representative, as you had with Mr. Elliott, you need to determine that you truly need that party and their corporate representative, and that there's no substitute. There's no one else who can do that job. This was Mr. Elliott, a high-level corporate officer, not someone who as a recipient witnessed anything. I think it would be extraordinarily difficult to justify deviating from the confrontation clause in that circumstance. And otherwise, then, really, we're going to have the exception become the rule, potentially, with great deference to District Court judges who can do this as they see fit. That's the opposite of what the Supreme Court has instructed is the correct approach to the confrontation clause. And I don't think this is an exceptional circumstance, even under this Court's decision in Gigante. Thank you, Your Honors. I know I've overstayed my welcome, but I appreciate it. Thank you. Good morning, Your Honors. Michael Artand for Rubin-Wigand. With the many issues that are before the Court, what I'd like to do is focus on the interplay of several issues and how they interrelated with respect to whether or not the defendants got a fair trial. And the issues I want to look at are sort of co-equal and they interrelate. So one of them is the trial court's refusal to allow the defense to argue that the lack of intended loss was not probative of intent. Basically, the court said you can't argue that for intent. You can only argue it for materiality. It becomes starkly important when you view that in the context of how the jury instructions basically got mashed up. And as counsel just argued, as Mr. Schaffer just argued, when you're lacking instructions to the jury about needing to have an intent to harm, it becomes more of a problem because we were curtailed from arguing that the lack of intended loss, and that's important because there was no intended loss. And in fact, as the Court knows, all the banks made money. They made millions of dollars. Find me another bank fraud case. Are we back to the same argument as to whether Section 2 requires intent to harm? You're arguing that it does? Yes, Your Honor. So that interplays with the trial court's prohibition on our calling expert Stephen Mott about how the transactions proceeded. And Mr. Mott was going to testify about the fact that the acquiring banks in Europe were underwriting the transactions for the U.S. banks. So the U.S. banks had no exposure whatsoever because the acquiring banks in Europe were underwriting the transactions. And the problem there is particularly emphasized when you look at the fact that the Court had a late instruction after summations, after all the closing arguments, basically conflating all of the transactions. And it's our contention that you must not conflate the transactions to get an accurate understanding of what happened. Well, you're describing it as conflating the transaction, but the charge is that this was an ongoing scheme. And so to say, well, they haven't shown that after this transaction that they found out it was illegal, it's not sort of, I don't... I respectfully can't accept that they were an ongoing transaction in the respect that when the merchant banks in Europe were given certain information, it was with the purpose of getting the merchant banks to underwrite what was going on with the U.S. banks. The MCC codes are irrelevant. And to put it in terms of within the last two weeks, firearms now have an MCC code. So from the beginning of MCC codes until just recently, there was no code for firearms. So the idea that there's no code for marijuana is a red herring. Because there's no code for marijuana, that doesn't mean that you can then put in a code for something else. You know, sunglasses, articles of clothing. It's still a misrepresentation, isn't it? It would be if the banks relied on those codes to approve the transactions. But that's not what was going on. It's an irrelevant fact. The MCC code is for different reasons. For different reasons. For banking, for tracking things. It's not to approve the transactions. Otherwise, we would have no firearm transactions for the last 50 years. There were $50 million worth of transactions involving banks and credit card companies thinking that this was legitimate legal merchandise when it was in fact marijuana. And they were not allowed to process those transactions. I would dispute that, Your Honor. They weren't thinking anything about the transactions' legality. What they were looking at was whether, and this is what the testimony of the bankers was, we look at whether they have credit worthiness and whether the transaction was approved. And that was what the bank looked at. The MCC codes were not the basis of any of the transaction authorizations. None of them. And so if they're never the basis, then how could it be material? And when you have a situation where $50 million worth of transactions were going through the Circle Wallet scenario where the company is named. And initially, the way it was briefed, the government approved of that and then they sort of backtracked a little. But the fact is, we talk about $150 million, there was $50 million where they were on notice of what was going on. Ease is a big company. It wasn't like a little mom paw store. It was a major company that was advertising and so on. So I would respectfully dispute the fact that the MCC codes had any relevance to anything with respect to any of the transactions being approved. Am I over? I'm sorry to not be. Am I over time-wise? You are, but certainly go ahead. I'm sorry. Isn't a credit card company a financial institution? Isn't a credit card company a financial institution? Not for purposes of bank fraud. The statute limits it to banks? According to 1344, your Honor, Visa and MasterCard are not U.S. banks. And so any defrauding of Visa and MasterCard is not bank fraud. And that's very clear from the statute and the law. And with that, I'd like to reserve. Thank you, Your Honors. Good morning, Your Honors. My name is Emily Dininger and I represent the United States in this appeal as I did in the District Court. I would like to reserve two minutes for rebuttal if the panel allows. The judgment of conviction in this case should be affirmed, except that the forfeiture order against Akhavan should be vacated and the case remanded for entry of a $17 million forfeiture order against Akhavan consistent with the District Court's factual findings below that he obtained that amount in gross proceeds from the bank fraud scheme. Now, there are a number of issues raised in this case, as you've already heard. I'll address some of those in turn. First, the evidence overwhelmingly established that the defendant's blatant and pervasive lives were guarding the fake merchants set up as fronts for eased dispensaries, which they do not was naturally and necessarily part of what the banks took into consideration when making authorization decisions regarding credit and debit card charges. Evidence also overwhelmingly established that the defendants possessed the requisite intent to obtain property from U.S. banks. That was the entire point of the scheme and no more is required under subsection 2 of the bank fraud statute. Even under subsection 2, no intent to, sorry, even under subsection 1, if this were a subsection 1 case, and I raise this only because this is the core of defendant's argument, no intent to cause harm is required. Shaw makes clear that all that is required is knowledge that the defendant's actions are likely to deprive a bank of its property interest. How do you respond to the argument that the MCC codes were irrelevant? Do the banks rely on that information? What does the record say? First of all, the record, all of the bank representatives testified that the banks did in fact take those MCC codes into account at the time of authorization decisions and as part of their ongoing fraud detection programs. But didn't they indicate, though, that how they're taken into account is with regard to just the other propriety of the transaction as a whole? Is it the right person? Do they have this money in their account? Was there evidence that we'd look at these codes to see whether or not this is an illegal transaction? I think that the code on its own could not tell you whether the transaction is illegal. But the bank representative's testimony was clear that they do take these codes into consideration when deciding whether to authorize. And that that goes beyond, is this your account and do you have enough money in that account? Bank of America testified, Richard Clough from Bank of America testified that they specifically look at merchant name, location, and category or MCC code to determine if it is an okay transaction within their various rules and to determine if it's lawful. Actors similarly testified that they hired a payment processor that acted as their agent that reviewed the transaction information they received for signs that it might be a prohibited transaction. I think Michael Steinbach from Citibank explained this the most fully in explaining that Citi has a decision engine, I think is what he referred to it, which consists of hundreds of thousands of complicated algorithms that process the transaction information to determine the level of each transaction's risk and based on that risk, whether a bad actor, but one of the types of bad actors they're looking for is not just merchants processing illegal transactions, but any merchant that might be submitting false information into the system. And the patterns that they see in merchant names and location info and MCC code factor into this analysis and are all being considered in the milliseconds before a transaction is authorized by the bank's systems. The evidence was also clear that this transaction information is taken into account as part of the bank's ongoing fraud detection and monitoring programs. Bank of America's was I think the most explicit in that they have a quarterly review specifically to search through the merchant names and see if any of them have indicia that they might be marijuana dispensaries or marijuana merchants. And if they are, they are referred to Visa and MasterCard for investigation and determination. If they are determined to be marijuana merchants, they were required to be terminated from the system. And I think there's no clearer showing that this was material to the banks. They did not care whether illegal or disguised transactions are being processed through the cards that they issue. I think on that point, I think the defendants also point to the evidence regarding Circle. And on that, I just want to note that there was no evidence in the record that any bank was aware of the Circle transactions on behalf of Ease at the time that they were being approved. The only bank that testified that they were aware of the Circle Star Ease transactions was Bank of America. And what they said is that when they became aware of those transactions, they referred them to Visa and MasterCard for investigation. Again, if anything that shows that that information is material, even if you set aside the fact that this is an entirely separate category of transactions. Can I just ask you though, so then the question is though, the information would never, or would the information ever be used to stop a transaction? Or is this all after the fact we're reviewing these codes and this is problematic so we should investigate? Because it seems as if in contemporaneously, it's not going to impact the clearing of a transaction. Or is there evidence that in fact, a particular transaction might be stopped if they looked at a code and thought this is questionable? I think the banks, as I said, explained that the transaction information is assessed for riskiness and indicators of risk and advance. And depending on the rules that are set in place at that time, which Citibank explained are constantly fluctuating, a certain MCC code might be being blocked. And we just don't know at the time. So there was the possibility that if they put in what was arguably truthful information, they were blocked. But I think it's also important to note that if the defendants had provided truthful information from the very beginning, these transactions would have never been permitted into the system because they would not have received merchant bank accounts. They would not have been permitted to enter into the Visa and MasterCard system. So in getting an MCC code, there is an implicit representation that we have a lawful product, a product that is admitted into Visa and MasterCard system. And that is part of the mechanism by which the banks are being naturally induced to rely on this information and why that information is material. Also, with regard to the confrontation clause, there was no abuse of discretion in the district court's finding that there were exceptional circumstances arising from the state of the COVID pandemic at that time and that Martin Elliott's age and specific health conditions had made him unavailable to appear in court in person. The defense argues essentially that the Sixth Amendment requires in-person confrontation, but that is not consistent with the precedent of the Supreme Court, specifically in Craig or this circuit in Gigante. Here, the district court found the Gigante standard was satisfied, as was the Craig standard, and there was no abuse of discretion or clear error in the factual findings underlying either of those findings. Finally, I do want to address our cross-appeal on the forfeiture. The district court erroneously concluded that requiring Akhavan to forfeit the criminal proceeds he obtained was constitutionally excessive. The defense does not dispute that there were legal errors in the district court's analysis or that there is not a single other case finding that forfeiture of criminal proceeds actually obtained, which is what the district court found that the $17 million was here, criminal proceeds, fees charged for this bank fraud scheme that Akhavan actually controlled and obtained, that forfeiting those funds would be a, there's no similar case finding that funds, criminal proceeds actually obtained would be a constitutionally excessive punitive measure. Instead, they fall back, the defense falls back primarily to arguing that the government failed to show that Akhavan, in fact, controlled that $17 million in fees, and that factual finding is plainly supported by the record and may be reviewed only for clear error. Isn't it the case, though, I mean, in deciding whether, I mean, because this is subject to review as a fine, it's not, you're not disputing that the court was able to analyze it? We do have standards in terms of what we look at or what makes something grossly disproportional constitutionally. Yes, and what we argue is that the district court didn't do that analysis. The district court. Well, it did do the analysis. It talked about the maximum sentence, the maximum fine. I mean, I understand you're disputing the correctness of the analysis. We agree that they looked at those factors. The factor it relied on the most heavily, though, was the statutory maximum fine and statutory maximum sentence. And as we set out in our brief, there were legal errors in its underlying analysis of that factor. But also, it's clear from the bigger picture what the district court did not do is after determining that the $17 million in proceeds, was the criminal proceeds obtained? And as section 982, the forfeiture statutes question says that they shall be ordered to forfeit those proceeds obtained directly or indirectly. The next question that the district court had to look at was whether it was grossly disproportionate. And we argue that he erred in that analysis. But then even if it was, what was the minimum that he could reduce it by and not have it be grossly disproportionate? That analysis the district court entirely skipped. And Costello makes clear that that is what was required. At what point, if you at what point is it that even with another, you know, even reducing it by another dollar, it would not be grossly disproportionate? Instead, the district court took the $17 million forfeiture order and reduced it all the way to $100,000. At which point it is clear he's doing a strict proportionality analysis because he says that I find that this amount is roughly proportional to the gravity of the defendant's offense. In doing that, he took his assessment of the gravity of the offense and replaced it for Congress' assessment of the gravity of the offense. How is this consistent with Congress' assessment of the gravity of the offense in your view? Well, I think the point of the Bozsikagian factors is as ways to assess how Congress viewed the severity of the offense and the gravity of the offense. Bozsikagian teaches that it is Congress' role to set the potential penalties for offense and to assess the gravity of the offense. That's why we look at things How does this relate to, how does this go against something that Congress has established? This reduction of the $17 million forfeiture? Because instead of looking at what the, first of all, instead of saying that the statutory amount that would be forfeited was the amount of gross proceeds obtained directly or indirectly, that was the $17 million. I'm sorry, but just while you're saying that, it's reminding me, is your view that as long as the amount can be argued it's equivalent to gross proceeds, then there's no potential for it being constitutionally problematic? Is there a case law that suggests that we start from the gross proceeds and that's probably fine and then we work from that? Well, so the statute requires forfeiture of gross proceeds. But this court in Bonventure did suggest, that's a non-precedential decision, but in that case the court said this cannot be grossly proportionate because it is the same as the gross proceeds. Right, but these are very fact specific. I mean, we go through those factors in each case. The government's position is that where you are only asking someone to forfeit their gain from the criminal offense, that it cannot be grossly disproportionate to the gravity of the offense. However, that is not, the court does not need to reach that to reverse and the district court, I think most glaringly, failed to consider what the maximum amount is that would not have been grossly disproportional and also had clear legal errors when it considered what the statutory maximum fine was. Now you didn't raise that at the time of sentencing. You didn't argue you accepted the statement that the one million dollars was the statutory maximum and then only subsequently raised this alternative penalty provision. At the time of sentencing there had been no contention at that point that the forfeiture order might be constitutionally excessive. It was not an issue that was in front that the government had to respond to. But isn't it a case, I mean aside from sort of formal, at the time of sentencing the pre-sentence report is saying one million dollars is a maximum and yes at that point this challenge had not occurred, but wasn't the government at that point, knowing this presumptive one million dollar maximum, was the government at that time asking for 156 million? Yes, we were. But the PSR, all it stated was that one million was the maximum statutory fine that was one million because there was no jury finding as to a greater loss or gain amount. However, that does not constrain the assessment of what the maximum statutory fine was that was authorized by Congress under section 3571 alternative fine provision. I guess I'm just suggesting, I'm sorry I'll let you finish, to the extent that you're saying well looking at the maximum fine that that somehow was that's guiding what the government is seeking. And so if at the time of sentencing the government knows it's going to ask for 156 million, it does seem like there might have been some incentive to say well in fact we do object to the one million dollar statutory determination that that's the I guess I'm just saying in terms of how that informed the government's decision to object or not to that given that you were seeking 156 million when you were at the point where you're saying oh the statutory maximum is one million. Respectfully, your honor, we did not have the ability to object accurately to that statement of the PSR because it is true that the district court could not impose more than a million under the statutory maximum because we had not asked the jury to make a finding of loss. However, at the first... So why should we consider this alternative maximum now? Because it's what is authorized by Congress and it is a reflection... But it wasn't authorized in this case? It couldn't have applied in this case? It was, whether the statute still applies Congress still implemented section 3571 which applies to bank fraud cases and just because we as a matter of prosecutorial discretion decided not to seek the jury finding that would have allowed us to seek to impose a larger fine at the time of sentencing has really no bearing on the statutes that they have enacted and it is again Congress' assessment of the gravity offense and whether the forfeiture order is grossly disproportional in comparison to that assessment that is an issue. The court will be the ones making the determination as to whether or not in this instance that was a constitution, this particular amount is constitutional. So I understand what you're saying about Congress setting certain parameters, but on the facts of this case is what we're going to be judging whether or not this is excessive. And the district court found on the facts of this case that Akhavan's gain, the proceeds that he obtained was $17 million. So under section 3571 twice the gross gain is $34 million. That is the authorized statutory maximum fine that has been authorized by Congress. So on the assumption that we don't accept the argument that you're just making now about the alternate provision for doubling what is your list, your catalog of the errors of law that the district court made in its determination that the $17 million forfeiture violated the 8th amendment? What's the full list of the errors of law made in that assessment, in that determination? So the statutory maximum fine we've already discussed. I think there is also a clear error in the district court's guidelines analysis and one of the things that it did look at was the maximum guidelines range. If it had followed section 2B1.1 and after concluding that Akhavan obtained more than $1 million in proceeds from a financial institution, that required the offense level to be stepped up to $24 at a minimum. That was not done. That was clear error. I think also the district court... The government didn't object to that either, I gather. No, Your Honor. We did not. It was as the... It did not be... We had not applied that particular provision of the guidelines in our analysis or in the PSR because our position was that the loss was $156 million and not zero. We also contend that the district court failed to give any weight to the fact that the statutory maximum sentence of bank fraud to be a particularly severe, serious and grave offense. But the government didn't seek that kind of sentence, correct? The guidelines range that the government proposed was significantly less than that, correct? I think our guidelines range... I don't remember what our guidelines range was at the time of sentencing, but I do think at the time of sentencing the PSR clearly stated the statutory maximum is 360 months. And again, the final error that I would point to is again that the... That even if you agree with the district court's analysis that the $17 million was grossly disproportionate, it then failed to take the necessary next step of considering what is the maximum amount that would not have been grossly disproportionate. I see I'm out of time unless the panel has any other questions. Was there a problem with the district court's computation of 17 to 1 saying... Assuming that $1 million was the maximum fine, which I know you disagree with, but assuming that was the... We deemed that the maximum fine, was there a problem with the district court saying 17 times that makes it grossly disproportionate and a violation of the Eighth Amendment? To what extent did the district court rely on that 17 times multiplier? Yes, Your Honor, and thank you for raising that. Assuming you accept that the statutory maximum fine is $1 million, and obviously the math of 17 to 1 is correct, that on its own does not make the forfeiture amount constitutionally excessive. Did the district court's reasoning imply that it was relying on that on its own as opposed to simply taking it account as a factor? It certainly implied, I think when you read the district court's opinion as a whole, that it's... The primary if not sole premise of its decision was what it viewed as a disparity between the statutory maximum fine and the fine that it had imposed and the $17 million forfeiture order. And there are other cases for example, Costello, in which this circuit has upheld forfeiture orders where the forfeiture amounts were many, many magnitude times greater than the statutory maximum fines and has concluded that those were not grossly disproportionate. Thank you. Thank you. Your Honors, I'll be very brief on intent and just refer this court to its decision in Chandler, 98F3rd at 715. And Judge LaValle, I want to emphasize that if the government can't show intent to harm, they can also show that something, a misrepresentation went to an essential element of the bargain with the bank, and they can establish intent that way. They never purported to pursue that theory of trial. They never sought a jury instruction on that. Let me turn to materiality. And here I would just direct your courts to the law firm decision of the U.S. Supreme Court on materiality, or when it talks about the by means of requirement of subsection 2, specifically Justice Kagan's opinion at 573 U.S. at 362 and 65. And the court's very concerned about not having an unbounded approach to federal bank fraud that displaces state law, among other things, and doesn't have any real limit. And she emphasizes, by means of mean what my friend for the government suggests it means. Today, Ms. Denninger says, recognizing she doesn't have the proof in the transaction information, well, maybe it's that merchant banks are able to onboard merchants, and if they hadn't done that in Europe, then they'd never be bringing their transactions to the U.S. through cardholders. That theory doesn't work. It's exactly what the Supreme Court ruled out with the counterfeit handbag example. You can't go hip bone connected to the thigh bone. The question is, was the misrepresentation, was it by means of the misrepresentation that bank property was released? That's the authorization decision, Your Honor. That's how the bank property gets released in this context. And I'd emphasize that even for the government's best evidence, what they cite from Mr. Clough in Bank of America, there's no retrospective review either, judgely, of an authorization decision. The money's never, in the history of this record, all the volumes of it, ever had a single transaction that was disapproved, even retroactively, because it was deemed to be marijuana related. And for Mr. Clough's testimony, I would just emphasize, Judge Chain, because the questions are about MCC codes, there's no testimony or evidence from anyone that an MCC code can ever be used, even truthfully, to discover a marijuana related transaction and disapprove it. That's not what Mr. Clough testified to. If you read his testimony, and I encourage you to do so, it's all about the merchant names. Those merchant names that can be gobbledygook, and it's only if the merchant name says cannabis or marijuana that it gets reported even to a credit card company, not a disapproval, but gets reported to a credit card company. There's no evidence that any of the truthful reporting of the merchant names, even if it was spelled out, would have led to that sort of reporting here. The last point about materiality, the jury instruction, Your Honors. The jury had none of the guidance that Your Honors have today. They were not directed to the need to inquire into whether the specific misrepresentations led to the specific bank decisions at issue or were capable of influencing them. That's the pattern jury instruction. It was not given. We did our best with the instruction that was given. We focused the jury on the authorization decisions exactly as was reflected in the court's announced instruction. And when the district court then corrected us post-closing, he told the jury to look at the whole picture, the opposite of what Laughlin has emphasized, the opposite of what the correct analysis requires, the opposite of what this court would be doing as it answers the materiality question as to sufficiency of the evidence. That alone, in our view, would necessitate reversal and remand for a new trial. And if I may briefly address forfeiture. Your Honors have talked a lot about the excessiveness of it constitutionally. We agree with the district court's analysis. I just want to emphasize that as to the statutory analysis, the district court correctly recognized that the $150 million number could not be attributed to Mr. Ackabon. It wasn't within his control. Exactly the same reasoning applies to these credit card fees that, yes, he as an intermediary had negotiated those, but then those agreed fees were necessarily and exactly paid out per legally binding agreements that said, among other things, Visa would get its prescribed fee for their transaction. That's what they're relying upon to say that there's $17 million controlled by Mr. Ackabon. You have to disregard the binding legal agreements and the uniform practice that these fees were necessarily honored as part of the agreed transaction change. So statutorily, we think you can't get to the $17 million even before you get to the excessiveness analysis. And when you get to the excessiveness analysis, the district court was exactly right and well within its discretion to analyze excessiveness as it did. Of course, if we hadn't objected to the pre-sentence... You're not disputing that he received $17 million? I am, Judge LaValle. There is no evidence in this record that the $17 million never went to a Ray Ackabon account, nothing that he controlled. What they're relying upon is because he was an intermediary who had negotiated transaction fees, all of the fees are then imputed to him. There is not in the record any evidence that that money flowed to a... The district court found that he controlled $17 million in proceeds, right? That was a binding decision. Absolutely, it was. But it contradicted, I believe, the reasoning of the district court in saying that $150 million, the total proceeds here, could not fairly be attributed to Mr. Ackabon. The same reasoning is no less applicable to the $17 million as our respectful submission, as to the statutory analysis. Is there something that suggests... What would your view be of his net proceeds if it's not just this amount that he controlled? So the amount that was actually awarded was that. It was e-stock that Mr. Ackabon derived as was agreed. That e-stock... The record suggested there was $8 million in profits to him. I think that that's based on the spreadsheet, Judge Shin, that the government is citing, and there's some backing and forthing on a footnote. What that spreadsheet says is that there's one column for Mr. Wygand, there's one column for Ackabon and Shinji, or Jaw 13. I think it's Jaw 13, which the government says where Jaw 13 was a nickname for Mr. Ackabon. But the district court did not make a finding on what the profits were. Exactly right. There's no finding on this, and if I could just... This gets, I know, into a very tangled record, but the government exhibit, that was 1801. And the government exhibit says that that payment went to, quote, Senjo Payment Asia PTE LTD. That's where the 5 million euros, or about $8 million US dollars went. There is not any evidence that Mr. Ackabon controlled Shinjo, or received payment from it. And again, all of this money is part of the assigned pot that goes to payouts to all of the different participants in the transaction chain, and there are legally binding agreements that dictate what everyone gets. This was not, at any point in time, Mr. Ackabon's money to claim, or control, or collect. That's a respectful submission, and I know I've gone beyond my time again. Thank you, Your Honors. Thank you. Your Honors, I'd like to address the government's contention about banking witnesses continuing to say, well, we don't want to do illegal transactions, we don't do illegal transactions. What they do and what they say are completely different things. So, we have one bank witness, I think it was Mr. Steinbach, but I might be wrong on that. His budget for fraud detection was $270 million. He spent zero money, zero dollars, on marijuana. And it's not as though the banks are not on notice that marijuana transactions are going on in California and Oregon, and that they're going on to the tune of hundreds of millions of dollars. So, when the government's asking that the lip service given by these bank employees and witnesses are, oh, well, you know, we don't do illegal transactions, it's utter nonsense. And it goes also to the fact that because the transactions are underwritten by merchant banks, they have no incentive or desire or they don't even want to know. And the fact that $50 million in circle transactions go undetected shows you they don't care. It shows you they're not looking. It shows you they have no interest. And if they have no interest, they don't care and they want their fees, then it's not material. The government just is not part of that logarithm and they're not part of the milliseconds. The fact is that what the banks look at are the credit worthiness and the authorization of the credit holder. And the banks were protected because the acquiring banks in Europe, which are not protected by 1344, those banks were underwriting the transactions. If anything, the misrepresentations were, in an oddball circumstance, they were protecting the U.S. banks. U.S. banks had no risk, no concern, and there was no material misrepresentation. Thank you. I just want to briefly respond to a few points raised by defense counsel. First, the defense is relying on Chandler for the proposition that an intent to cause harm is required. In a more recent case law, under Shaw and Loughran and Lebedev, it is clear that that is no longer the case. Loughran says that under subsection 2, all you need is an intent to obtain bank property. Shaw says that even under subsection 1, all you need is knowledge that you are likely going to deprive a bank of a property interest. Defense has also argued that the jury instruction erred because it failed to direct the jury to inquire into whether the specific misrepresentations was the means of the bank making its decisions. That is just not true. The district court instructed the jury correctly that they must consider whether a reasonable banker would be reasonably likely to consider the defendant's misrepresentations in making a decision authorizing a bank transaction. That was the materiality standard. The district court instructed the jury on the means of standard three separate times. He told them that a scheme to defraud means a scheme to use one or more misrepresentations to obtain money or property from a bank. He told them that the government must show that the bank was induced to authorize the transaction by means of the misrepresentations. And he instructed that specific intent to defraud in this case, because it was a subsection 2 case, requires intent to use, again that goes back to by means of, misrepresentations to obtain money or property from a federally insured bank. Going to the issue of forfeiture as to the $17 million, there's no clear error in the district court's decision that Akhavan obtained the $17 million in proceeds. There's plenty of evidentiary record in the evidence that Akhavan dictated the amount of fees that would be set. That Akhavan, and that that then led that he directed co-conspirators to obtain the bank accounts that would be used to collect those fees. And that his dictating of the fees controlled what amount got dispersed to various co-conspirators. What went out to the eased merchants versus what was withheld by the co-conspirators, which was those fees. On the profit, I only want to note that defense counsel, I believe, is mistaken when it says that government exhibit 1518, which is the spreadsheet that refers to the profits that were actually made, only refers to Senjo. That is not true. The column that we refer to as, that we and as the footnote in our brief explains, there was actually extensive evidence at trial that jaw 13 was a name used by Akhavan across social media and messaging applications. As for materiality, counsel for Wigan contends that the banks knew and just allowed these transactions. Every bank representative testified to the contrary. That if they had known, they would not have knowingly allowed these transactions. That they would have cared about the fact that they were disguised. That they would have cared about the fact that they were actually illegal transactions for marijuana. Michael Seinbach testified that he had a $276 million fraud budget. It is true that none of that was specifically aimed at marijuana, but it was $260 million aimed at ferreting out fraud in the credit card transaction. And that included, again, fraud in merchants submitting false information and fraud in merchants submitting illegal transactions. So all the evidence showed is that to the extent the banks were not aware of, that at worst the banks were not aware of the marijuana transactions and that that was a result of limitations of resources and decisions made for other reasons, not because they just didn't care about these transactions. Thank you. Thank you to all of you. We'll take the case under advisement.